Good morning. I'm Amitai Schwartz, representing the defendant and appellant Domonic McCarns. I'd like to reserve three minutes for rebuttal. You'll have to help keep track of your time. Thank you. I raised a host of issues in the briefs, and I don't intend to address each of the issues unless the court would like me to. What I do intend to address is the constructive amendment argument, and then as to sentencing, the amount of the intended loss enhancement and then the role and the offense enhancement, and that is whether Dominic McCarns was, in fact, a manager or a supervisor, which resulted in a three-level addition. With regard to the constructive amendment, the issue here is somewhat different than the issue of whether the instructions themselves adequately covered the elements of the crime of conspiracy to commit mail fraud. The indictment very clearly set out what the allegation was, and this was the indictment that was, of course, found by the grand jury. And the grand jury said that McCarns and the other conspirators who were indicted for the crime of conspiracy to commit mail fraud had engaged in a scheme and an artifice to defraud. But then it went on to say that they also used the United States Mail and any private or commercial interstate carrier to execute the scheme and artifice to defraud in violation of Title 18, Section 1341, mail fraud. When the Court gave the instructions to the jury, it didn't say that. What it said was that it laid out the elements of the crime of conspiracy, and it did that quite clearly, and it talked about the objective of the conspiracy being to defraud individuals of the equity in their homes and so forth. And it wasn't until the second part of the set of instructions, which dealt solely with another defendant, Charles Head, and who was charged with mail fraud. It was at that point that the Court actually explained what this United States Code section was. Sotomayor, what's our standard of review here? There was no objection made at the time, as I understand it. Plain error. Well, one of the elements of plain error is prejudice. I mean, that's a shorthand. But there was a stipulation in this case, as I understand it, that the mails were used to send deeds to the owners of the property, and there was evidence that your client had discussed overnighting documents with one of the pro-conspirators. So what possible prejudice is there to your client? The prejudice, and that's why this issue is actually different from the issue of whether the instruction was correct, because under this argument, the issue is whether or not McCarns was inducted, whether he was tried for the same crime that the grand jury indicted him for. Well, there's an — it seems to me that there's no possibility that the jury would have convicted him on some other theory, given what I've just said about the stipulation and the other evidence of mailing. I guess I just don't see how it could possibly  No, I think — well, shouldn't we read the instructions as a whole, not just one piece of it? Well, what happens is there was so much overwhelming evidence of fraud here. There's no question about that. Most of it went to Charles Head, but since McCarns was tried at the same table as Charles Head, it was very easy and most likely that the jurors focused on the fraud. I mean, they brought in victims. Well, but the conspiracy is to commit fraud. And the actual acts of mail fraud are charged as overt acts in furtherance of the conspiracy, are they not? Frankly, I'm at a bit of a loss to understand why you opened on this issue. This is not your strongest argument. Well, I'll tell you why I opened on it, because I think it's somewhat difficult to understand in the sense that it's a more complex argument. It's a different argument than the argument that the instruction was wrong. Well, was my premise question correct? Weren't the acts, the substantive acts charged in the separate counts of mail fraud alleged to be overt acts in furtherance of the conspiracy to commit mail fraud? Isn't that what the Court told the jury to consider? No. The overt acts of mail fraud were only charges against Charles Head. Counsel, Head is charged as a co-conspirator, is he not? Yes. So an act by a co-conspirator, once an agreement is reached to engage in illegal conduct, which is found by the jury to be in furtherance of the conspiracy, completes the crime of conspiracy under Federal law, does it not? Yes. So what's the problem here? The question is whether the instructions left out an essential element of the crime charged by the grand jury, not the theoretical crime of mail fraud, not the real crime. But in light of the stipulation, as Judge Graber reminded you, what was the harm? Well, there's a stipulation as to certain facts, but here, I mean, the point I'm trying to make, and I'll leave it, is that McCarn's had a right to be tried as the case was But there has to be a the instructions have to line up with the indictment in terms of the description of the charge. You can't leave something out. But wasn't the jury told that they have to determine that at the time that the defendant joined the conspiracy, that these acts were reasonably foreseeable acts that would be carried out in furtherance of the conspiracy? Yes. So, again, where's the error here? I mean, it looked to me like she gave a correct statement in her jury instructions of the law of conspiracy and Pinkerton liability for co-conspirators who join an ongoing conspiracy. Right. But that's not the – that's not – that's not this issue. This issue is whether she left out in the instruction and the way it was given in the The conspiracy only applied – the conspiracy instruction only applied to McCarn's, Boudoff, and Head. And then the mail fraud – But McCarn's doesn't have to commit the overt act. All he has to do is knowingly join the conspiracy to commit fraud, and thereafter a co-conspirator commits an act in furtherance of the conspiracy, correct? That's substantive conspiracy law, Criminal Law 101. Right. Okay? She did that in the instructions. Okay. Well, all right. Where's the beef? My point is that when you line the indictment up with the instructions, they are different. But let – if I may, I'll move on because I don't want to – I don't want to – I have a limited amount of time here. I want to talk about sentencing in terms of the amount of the loss. The way this scheme was structured, there were two – two ends to it. One was bringing the victims in, the homeowner victims in, and McCarn's was a salesperson, consultant, underwriter. They called him various things. His job was to lure these people in. And he was – he was good at it, and he bragged about it. But he had no dealings with the lenders. The lenders was Benjamin Budoff's responsibility and Ko Yang's responsibility. So there's – there's practically no evidence that McCarn's had any responsibility with regard to dealing with the lenders. How does McCarn's get – how does McCarn's think he's going to get paid if he brings in these victims and the scheme is to defraud them of the equity in their homes by getting them to deed the property so that loans can be obtained for the maximum amount available in the equity, which then gets skimmed off the top when the house is foreclosed? Where did Mr. McCarn's think the money was coming from to pay him his commission? Well, he probably knew the – he knew where the money was coming from, but that's not the – So doesn't that make it foreseeable? Not under – not under – the sentencing guidelines is supposed to be foreseeable within the scope of his agreement with the co-conspirators. In other words – You're taking an incredibly narrow view of a conspiracy under 371 and 1341 and 1343. I'm – I'm frankly having a hard time understanding the logic of your argument. I don't mean to be insulting, but I'm just – I'm just struggling with a basis to see the distinction. I'm not talking about the sentencing guideline here. I'm talking about whether you can't – Right, which speaks of reasonably foreseeable losses to the – once the defendant joins the conspiracy. But in terms of his role in the conspiracy, which was dealing with the homeowners, to the extent that the sentencing, the amount of the loss should have been figured, it should have been figured based on the foreseeable amount of loss to the homeowners because it wasn't his job. It wasn't part of his responsibility. Sure it was part of the conspiracy, but that's not the issue with regard to sentencing and to valuing the loss. But how is this any different from a drug conspiracy where the co-conspirator is tagged for the entire scope of the quantity of narcotics distributed by the enterprise, whether he personally distributed all the drugs or not? Well, I think – If it's reasonably foreseeable to him that all this money is going to be fleeced from as many victims as the conspirators can lure into the scheme, why is it unfair under the sentencing guidelines to tag him for the amounts that are reasonably foreseeable from the successful perpetuation of the scheme? Well, because in this – in this particular scheme, there was a bifurcation of roles. These – the people dealing with the lenders were in different offices. There were a different set of people. They were – Counsel, what difference does that make if McCormick knew that lenders were involved? He also stressed in emails to the loan processing department about receiving payoffs when loans were closed, his insistence to close more deals if the scheme had more loan processors, and lenders were more likely to lend if properties were not in the floodplain. That shows a lot of knowledge to me by him that lenders would have losses. Yeah, I'm not – I'm not talking – I'm not arguing knowledge or lack of knowledge. I'm arguing about what his role was. You talked about foreseeability. Right, right. But in terms of the role he was playing with regard to this – to this scheme, I've only got a couple of minutes. Let me just deal with the role of the defense, because you got three points for this. There's no evidence that McCardin's managed anybody. He didn't discipline anyone. He didn't hire anyone. He was – Isn't your main point that almost the entirety of the evidence about his role postdates the end of the conspiracy as charged? Excuse me? Isn't the essence of your argument that the evidence, with one or two tiny exceptions, all postdates the end of the conspiracy as it was charged? That's right. Okay. And that's – that's not relevant conduct. Given the fact that – oh, go ahead. No, go ahead. I was going to say, is it a permissible inference that the managerial or leadership role that he took on later would have happened during the existence of the conspiracy, or is that not a fair inference? No, it's not a fair inference, because for two reasons. Number one, the – the probation officer who wrote the PSR said, quoting the U.S. Attorney's Office, that McCardin had worked his way into a supervisory role. And the judge – second, the judge accepted that. If he worked his way up, then at best – We don't know when, is your point. Then at best, those e-mails showed that that's – you know, finally, when this other guy bought the company, McCardin had worked his way up. But during the conspiracy period, which ended in June 2006, there's – there's no evidence that he – that he was a manager. He was a gung-ho employee. There's no question about it. But you don't get three points for being gung-ho. You are almost out of time. If you'd like to save some for me, please. I'll reserve. I may. Thank you. Good morning, Your Honor. May it please the Court. Matthew Morris. I represent the United States. I was one of two of the prosecutors at trial and at sentencing in this case. Your Honor, I'll focus on items that have come up here in an argument and then try, if I have time, to address the – the various other issues that are raised. There were many, I think, eight total issues. On this question of the constructive amendment, Your Honor, I agree with – with you, Judge Tallman, that there is no error here. The – the instructions are correct. They simply reflect what was actually charged, which was this was a conspiracy that involves the use of the mails. It's stated in – in the indictment. And then the instructions correctly said, laid out the elements of conspiracy to commit mail fraud, and then additionally correctly laid out the elements of mail fraud. With respect to a co-conspirator? That's not clear, Your Honor. So it does say that Charles Head is charged with the – the substantive counts. Right. And then says, but for a person to be guilty of that, here's what those elements are. Well, but the – I'm trying to recall now if there was an instruction to try to keep the defendant straight and deal with each one separately. I think that's usually a standard instruction. So if it says, you know, Defendant A is charged with mail fraud, and here are the elements of his crime. It's – it's separate, Your Honor. So the charge, I think, that the Court's thinking about is Instruction 20. That's an excerpt of the record, page 233. So that's the one that spells out what each person is charged with. And then Instruction 21 on the next page, excerpt of the record 234, is where the elements of conspiracy are set out, and then Instruction 26 at ER 240 was the elements of the substantive counts. Right. Which starts out by saying Charles Head is charged with mail fraud, blah, blah, blah. And it says the defendant, meaning Charles Head, did these things. And which gets to the, I think, even if the Court were to not agree with Judge Tolman and the government that there was no error, then we get into this question of was it plain error. Right. Was there prejudice? Or then under the fourth prong under Olano, not only is there prejudice, but is the integrity of the judicial proceeding called into question? And I think that goes to Judge Graber to your questions earlier, is what would happen if this had been instructed as it is? The same thing. He still would have stipulated that mailings were involved. He still would have stipulated that these e-mails show that he's talking about the mailings. And there's no allegation that these two instructions, 21 and 26, misstate any element. So all we would do would be go back and try to find a way to balance 21 and 26 in a way that more clearly resolves this issue. And that really gets to the issue of why this is up on plain error review. Rule 30 says you're supposed to object to these before the jury gets the instructions to give the district judge the opportunity to work these out with the parties. I have a question for you that is not related to any of the issues that have been raised so far, and it's just what I call the shorthand, T-2 and so forth. Is this a common thing in this district for judges to use the shorthand? Yes, Your Honor, it is. I — on my experience, I would say almost always, especially if it's one of these ones for a continuance under what we call T-4, which is an ends-of-justice continuance for defense preparation. If it were a less frequently used exclusion, when you get into things like a code offendance not available or we've written into State custody for a State proceeding, there are local codes that apply to those, but they're used far less often. The stated purpose in General Order 479 is the shorthand makes it more efficient to make the findings and more efficient for the courtroom deputies to document on the docket why the exclusion was made. So they are — they are used frequently, especially for the most common ones, to avoid, frankly, the recitation of statutory language and or statutory citations. T-4 exclusion for the next two months is much different than I find that the ends-of-justice is granted and then having to cite 31 sections. I was really more curious because I hadn't — wasn't familiar with that previously. Very common practice in the district, Your Honor. It's also a fairly common practice in State court in California, is it not? That's outside my understanding, Your Honor, as well as I don't know the rest of them. They like these preprinted forms where you just go through and check the box. That I have seen. Call the next case. I have seen that when we get those documents as part of a criminal history. Yeah. My other concern is about the — about the leadership role. Basically, it seemed like all the evidence, save maybe one or two — maybe two emails, all significantly post-date the end of the conspiracy as charged. And I just was — was troubled by the reliance on a leadership role potentially acquired after the end of the conspiracy as charged because that wouldn't mean that he was a leader during the time of the conspiracy. So what is your best evidence in the record that demonstrates the applicability of that enhancement during the time of the conspiracy before June of 2006? Well, let me address that or answer that first by saying it's not the case that the conspiracy ends in June. So the language of the indictment specifically says continuing until at least June 30th of 2006. And, in fact, the overt acts that are listed for Mr. McCarns — this is paragraph 31 of the indictment — specifically listed overt acts that happened in August of 2006. So it's clear that the conspiracy as charged doesn't end in June. It goes at least June 30th with overt acts at least into August. The second answer to that is the court — the district court found that the relevant conduct included conduct, at least for McCarns, up until the very end. So the leadership could have been exerted in October. And having found that the relevant conduct is there, it's a fair application to him. And finally, then I think to get to the third answer to the question, it isn't just one or two e-mails. So we have all the way back in May — Well, yeah, well, it's not a lot before June of 2006. Some of it was in October of 2006, as I recall, that sort of retraining the salespeople stuff happened quite late. Yeah, the retraining was in October of 2006. There's no date on the organizational chart. The organizational chart certainly reflects what is in those e-mails in October. When was that prepared? We don't know, Your Honor. But it does reflect the same five people who are under Mr. McCarns on the organization chart are the ones that he's instructing and telling you, I'm going to retrain you in October. But likewise, August of 2006, during the month when the overt acts are actually charged and the indictment is when he's directing people to pay off vendors for appraisals that were done and notary functions that were done in different states, and in June of 2006, even if the court were to use June of 2006 as the ending date, the indictment clearly says it goes beyond that, that's where the e-mails are where he's assigning tasks to junior loan processors. Counsel, doesn't the organizational chart show that Head was no longer running the company when it was prepared and that would have been after the end of the conspiracy? Your Honor, the testimony at trial was that there was no change, that this was a sham transaction, essentially. Once the FBI started calling, Charles had executed a — on paper, a sale of the company. But the insiders, Ku Yang and Keith Brodmarkle, both testified there was no change in terms of who was actually running things up until the very end. I may have misread this, but I — didn't the district court sentence under the sentence at the low end of the guideline range on McCarns? Yes, Your Honor. So this goes, I think, to what was the eighth issue raised, which is the substantive reasonableness of the sentence. She varied downward by six years below the low end. So I guess what I'm asking is, does it make any difference with regard to the enhancement for leadership or supervisory role, given the fact that she departed downward by 72 months? Your Honor, I certainly want to — before I answer that, I want to see exactly where the guidelines would have come out if there were three levels less. I think that's right. Well, the guidelines — in this case, the guideline sentence actually is the statutory maximum. So all the enhancements — I mean, that's an interesting conversation, but all the enhancements are not relevant, because the guideline sentence is 240 months. It was. And so in the unlikely event that those three levels got it below 240, now it would be — It didn't. Okay. Then in that case, there would be no difference, Your Honor. That's what I thought. Okay. Thank you. Thank you. Thank you. Thank you. I'll address then this question of loss just briefly while I can. To be clear, it isn't just what was reasonably foreseeable. Dominic McCarns confessed in an interview while he was in State prison on different charges to the agents in this case that he knew that false statements were being made to lenders about the seeding of the straw buyer's accounts. So there are some defendants who knew about the loss to lenders but not homeowners. There were some defendants who knew about losses to homeowners but not lenders. McCarns was one of the handful who knew and admitted that he knew about false statements being made on both ends of this scheme. And just, Tom, and I think your analysis is correct, that for somebody who is as involved as he is, where do you think the money is coming from is a fair argument for anybody. But in this case, he says he knew where it was coming from. He knew what was going on, which is that they were having to make false representation to lenders about these straw buyers in order to get the money. It's one thing to convince somebody to sign over title and equity. You don't actually get your hands on the cash until a new lender comes in and finances up to the level of the value of the house, and that's how you get that equity that they were searching for. So I think I've covered the three items that have been raised already. I can address briefly, then, the other issues that have been raised in the brief. On the question of the Speedy Trial Act, two prior panels of this Court have affirmed the exact order that's at issue here. That's U.S. v. Pulley in 2016 and U.S. v. Head in 2017. Those two unpublished opinions relied on this Court's published opinion in Medina that says there's no requirement to recite the statutory language as long as the record shows what was being considered. I think we've addressed the jury instructions. The question of his identity being proven, this was not preserved in a Rule 29 motion, so it's waived. Even if it had been preserved in the Rule 29 motion, there was ample evidence of his identity at the time that the 29 motion should have been made. That included even his own stipulations that these e-mails were, in fact, sent and received by him, his lawyer introducing him to the jury as the defendant, insiders testifying about his role, and the law enforcement interview. Granted, none of those people actually did an in-court stand-up. Yes, I'm pointing at the defendant, but this Court says that's not required where this other evidence allows the inference. And then was it one of his witnesses did an in-court identification during the defense case? That's right, Your Honor. On the question of the severance, there was no improper spillover of evidence here. There was we're talking about a five-week mortgage fraud trial, and the complaint is that one e-mail, Government's Exhibit 101, and two witnesses, an insider and a victim of Charles Head specifically, testified about Charles Head's knowledge. In every instance where that evidence came in, the government stopped, asked the district judge, now would be the time that would be appropriate for you to give the 404B instruction. The Court gave the instruction. Every time we referenced that in our closing argument, we said, and remember, this is one of those items that is admissible only against Charles Head. And, of course, the district court reaffirmed that in the final instructions, and that's at ER 230. We've addressed the question of loss. The section of the transcript is ER 1752 to 66, so 14 pages of sentencing transcript where the district judge considered the arguments being made, both at the time and on appeal, engaged with them, and ultimately said, I agree with the government. The loss is well over 9 million. She found it to be slightly more than 12 million. On the question of the vulnerable victims enhancement, Peters is the case that's on point. Peters is the case that the district court cited. The district court considered and rejected whether Castellanos somehow changes Peters. This court has considered and rejected whether Castellanos has changed Peters, and that's in the Weiss-Gadel case that's cited by the defense. And then in two prior cases out of this particular conspiracy, the vulnerable victims enhancement has been applied and upheld by this court, and that was with Leonard Bernot. Judge Graber, you were on that panel, as well as Charles Head and Mike Head. It applied to them. In both cases, the panel cited simply to Peters and said, in light of Peters, that's what's appropriate in this case as well. I think we've addressed the leadership enhancement, and finally, the substantive reasonableness of the sentence. The sections of the excerpts of the record are 1868 to 1873. The court clearly considered the arguments for both departures and variances, engaged with the parties' arguments, and ultimately concluded that a sentence six years below the guidelines was the appropriate sentence in the light of the factors of 3553. Almost out of time. If there's any other questions, I'll address those. I don't believe so. Thank you, Counsel. Thank you, Your Honors. Mr. Schwartz. I'd like to address Judge Tallman's question to the U.S. attorney about whether or not it makes a difference because the judge had given a below-guidelines sentence. And the case law in the Ninth Circuit is that if the guidelines are miscalculated, it's a procedural error. But the guideline here, the guideline sentence here is 240 months, the statutory maximum. Right. Right? But — Is that right? Excuse me? Do you agree that the statutory maximum is the guideline sentence in this case? Yes. It's 20 years. Right. But the question is whether, if you knock off, assuming we are correct and that the court erred in finding that McCarns was a manager or a supervisor, if you knock off — But why doesn't that pass out of the case? Because the resulting guideline range, with or without that enhancement, is greater than 240 months. And so under Guideline 5G1.1, the statutory maximum is the guideline sentence. So why isn't all that irrelevant? Well, I think — I think ultimately it's up to the district court. Because the district — the district court — If we remand on this, are you going to — do you think you're going to get a lower sentence? You might. If the — if one of the — one of the issues that the district court took into account when she knocked off 6 years, instead of, say, 7 years or 8 years, was the fact that she considered him to be a supervisor or a manager, within the meaning of the guidelines, then a remand would give her the opportunity to reconsider that. And I think that McCarns should have the opportunity to argue that, because if — if a mistake was made here, then the question becomes whether that would have affected her ultimate sentence. And I think it's impossible to know. And at that point, I'll thank the Court. Thank you, counsel. Thank you very much, Justice Ward. The case just argued is submitted, and we appreciate both counsel's helpful arguments. You okay to keep going? Yeah. Okay.
judges: Graber, Tallman, Lemelle